UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DEWAYNE D. KNIGHT,

                              Plaintiff,

          v.                                    Case No. 21-cv-616-pp

ZACHARY LANGE,

                              Defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 13), DENYING PLAINTIFF'S MOTION FOR SANCTIONS (DKT. NO. 21), DENYING AS MOOT PLAINTIFF'S MOTION TO STAY PROCEEDINGS (DKT. NO. 23) AND MOTION TO APPOINT COUNSEL (DKT. NO. 35) AND DISMISSING CASE

Plaintiff DeWayne D. Knight, an incarcerated person representing himself, is proceeding under 42 U.S.C. §1983 on Eighth Amendment claims against a correctional officer at Waupun Correctional Institution. The defendant has filed a motion for summary judgment. Dkt. No. 13. The plaintiff asked the court to stay his deadline to respond to the defendant's motion, dkt. no. 23, but then filed a response, dkt. no. 24. The plaintiff also has asked the court to impose sanctions against the defendant, dkt. no. 21, and to appoint him counsel, dkt. no. 35. The court finds that the defendant is entitled to judgment as a matter of law, grants his motion and dismisses the case. The court denies the plaintiff's motion for sanctions and denies as moot his motions for a stay and to appoint him counsel.

Case 2:21-cv-00616-PP   Filed 11/04/22   Page 1 of 35   Document 36

## I. Facts

### A. Procedural Background

The plaintiff filed his complaint on May 17, 2021, alleging that Waupun Correctional Officer Zachary Lange failed to intervene to prevent the plaintiff from harming himself. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on an Eighth Amendment claim against Lange. Dkt. No. 7. On September 21, 2021, the court entered a scheduling order setting deadlines for discovery and dispositive motions. Dkt. No. 12. The parties did not file any motions during the discovery phase of the litigation. On March 26, 2022, the defendant moved for summary judgment. Dkt. No. 13.

A little over a week later, on April 4, 2022, the court received from the plaintiff a motion for sanctions. Dkt. No. 21. He claimed that the defendant's affidavit in support of summary judgment was false. Id. at 4-7.

On April 13, 2022, the court received from the plaintiff a "motion to stay proceedings." Dkt. No. 23. The plaintiff argued that his motion for sanctions "could determine the outcome of this case as the court could deny the defendant['s] motion for summary judgment and grant the relief requested by the plaintiff." Id. at 1. The plaintiff asked the court to stay his deadline to respond to the defendant's summary judgment motion until it had ruled on his motion for sanctions. Id.

Although the plaintiff had asked for a stay of the proceedings, on April 20, 2022—just a week after the court received the motion for a stay—the court received from the plaintiff his brief in opposition to the motion for summary

judgment (dkt. no. 24), his proposed findings of fact (dkt. no. 25), his response to the defendant's proposed findings of fact (dkt. no. 26) and supporting declarations (dkt. nos. 27-28).

The defendant since has filed a brief in opposition to the plaintiff's motion for sanctions, dkt. no. 29, and a reply brief in support of his motion for summary judgment, dkt. no. 33.

After briefing had closed, the plaintiff filed a motion asking the court to appoint him counsel. Dkt. No. 35.

    B.    <u>Factual Background</u>

The plaintiff has been incarcerated at Waupun since March 27, 2019. Dkt. No. 15 at ¶1. Defendant Zachary Lange is a correctional officer at Waupun and has been since January 21, 2020. <u>Id.</u> at ¶2. The defendant avers that, as a correctional officer, he is responsible for the security, custody, control and treatment of incarcerated persons. Dkt. No. 18 at ¶3. That includes supervising incarcerated persons in work or housing unit situations, escorting them off grounds and patrolling Waupun and its grounds. <u>Id.</u>

The court allowed the plaintiff to proceed on an Eighth Amendment claim alleging that on July 19, 2020, the defendant was deliberately indifferent to the plaintiff's risk of self-harm. Dkt. No. 7 at 5–6. The plaintiff claims that the defendant knew the plaintiff had expressed suicidal thoughts and had requested to be restrained, but that the defendant did not accede to his request despite seeing the plaintiff "biting on his right wrist." <u>Id.</u> at 4 (quoting Dkt. No. 1 at ¶12). He says the defendant "said nothing and did not intervene or inform

3

a sergeant or supervisor of the plaintiff's actions." Id. (citing Dkt. No. 1 at ¶13). The plaintiff alleges that he eventually "chewed 'a nickel sized "hole" in his wrist.'" Id. (quoting Dkt. No. 1 at ¶15). The plaintiff alleges that the defendant "watched him bite the hole in his wrist but made no effort to intervene and did not even tell him to stop." Id. (citing Dkt. No. 1 at ¶¶16–18).

### 1. *Observation Status and Use of Bed Restraints*

The defendant submitted declarations from two non-party officials at Waupun. Dkt. Nos. 16, 17. Torria Van Buren is the Psychologist Supervisor in the Psychological Services Unit ("PSU") at Waupun and has been since February 4, 2018. Dkt. No. 15 at ¶3. Robert Weinman is the Health Services Manager and Nursing Supervisor in the Health Services Unit ("HSU") at Waupun and has been since September 2020. Id. at ¶4.

Van Buren explains that clinical observation status is a non-punitive, restricted status used for the temporary confinement of an incarcerated person to ensure his safety and the safety of others. Dkt. No. 17 at ¶8. Unit staff check on incarcerated persons in observation status every fifteen minutes during the day and night. Id. During business days, PSU staff conduct rounds of incarcerated persons on observation status for reassessment to determine whether they should remain on observation status. Id. HSU staff medically evaluate incarcerated persons on observation at least once per day. Id. The PSU's goal is to provide appropriate mental health therapy and care to incarcerated persons using the least restrictive environment necessary. Id. at ¶11.

PSU staff may determine that an incarcerated person should be placed in restraints for his own safety. Id. at ¶9. Van Buren avers that that is a matter of the PSU staff's professional judgment based on the nature of an incarcerated person's threat to harm himself, any stated plan or action taken toward that self-harm, any property he has available to carry out that plan or action, his history of misusing property while on observation status and the incarcerated person's willingness to cooperate with assessment and staff. Id. Before restraining an incarcerated person, staff first attempt to deescalate dangerous behavior, gain voluntary compliance and use less-restrictive options. Id. at ¶10. Corrections staff involve qualified PSU and HSU staff in the decision regarding whether to use mechanical restraints. Id. PSU staff do not typically place incarcerated persons in bed restraints per their request or in response to superficial harm. Id. at ¶15.

### 2. The Plaintiff's History of Self-Harm

Van Buren avers that it is "sometimes common" for incarcerated persons to threaten self-harm for secondary gain—to get attention, manipulate staff into getting something they want or express frustration with staff. Id. at ¶17. She avers that the plaintiff had been placed on clinical observation status from June 24 to 26, 2020, and again from June 27 to July 14, 2020. Id. at ¶18. On the first occasion, the plaintiff told Waupun staff that he was suicidal and complained about disciplinary matters and his conditions of confinement. Id. at ¶19; Dkt. No. 17-1 at 31–32. When staff told him he would be placed on observation status, the plaintiff "became angry and attempted to recant his

5

suicidal statements." Dkt. No. 17 at ¶19; Dkt. No. 17-1 at 31. The plaintiff later threatened not to comply with his placement on observation status and to "slit [his] throat when [he] get[s] back to GP [general population]." Dkt. No. 17 at ¶19; Dkt. No. 17-1 at 31. The next day, during an observation review, the plaintiff denied being suicidal at the time he was placed on observation status and said he made suicidal statements to draw attention to issues about his property, a phone call and his placement on temporary lock-up. Dkt. No. 17 at ¶20; Dkt. No. 17-1 at 31. He remained on observation status because his "statements regarding his suicidality were inconsistent, at one point denying current suicidal or self-harm ideation, but later saying he would not inform security if he was experiencing self-harm thoughts." Dkt. No. 17 at ¶20. At one point, he yelled that if he was taken off observation status he was going to kill himself. Id.

Van Buren avers that on June 26, 2020, the plaintiff told PSU staff "he felt 'fine'" and did not believe he needed to be on observation status; he indicated that he was upset at not being able to use his phone and was concerned about his property, and he denied having said he was suicidal. Id. at ¶21; Dkt. No. 17-1 at 28–29. He was released from observation status at that time. Dkt. No. 17 at ¶21; Dkt. No. 17-1 at 29. But the next day, he threatened to hang himself with a bedsheet and said he would remain "suicidal every day until [he] can go back to GP," stating that he planned "to remain in observation status until his disciplinary separate time was served." Dkt. No. 17 at ¶22; Dkt.

No. 17-1 at 25–28. Prison staff informed the plaintiff that he would remain on observation status. Dkt. No. 17-1 at 26.

On July 6, 2020, security staff informed the crisis clinician that the plaintiff was agitated about his back-of-cell restriction and refused to comply with security directives. Dkt. No. 17 at ¶23; Dkt. No. 17-1 at 20. Because he did not comply, staff did not provide him with his psychotropic medications. Dkt. No. 17 at ¶23; Dkt. No. 17-1 at 20. Staff notified the HSU that the plaintiff had bit his right wrist, dkt. no. 17 at ¶23, and the HSU reported "a quarter size bite wound" on his right wrist, dkt. no. 16-1 at 15. The wound was not bleeding, and HSU staff cleaned it, applied Bacitracin and covered it with gauze. Dkt. No. 16-1 at 15. The plaintiff later told a PSU clinician that he "cut his right wrist by scrap[]ing it on his cell door" because he was frustrated that he had to comply with his back-of-cell restriction to receive medications. Dkt. No. 17 at ¶23; Dkt. No. 17-1 at 20. He agreed to allow the HSU to treat his wound but threatened to resume harming himself if staff did not provide his morning medication. Dkt. No. 17 at ¶23; Dkt. No. 17-1 at 20.

The next day, PSU staff again met with the plaintiff. Dkt. No. 17 at ¶24; Dkt. No. 17-1 at 18–19. The plaintiff remained frustrated about his back-of-cell restriction but said he was eventually provided his medication and had no reason to continue self-harming. Dkt. No. 17 at ¶24; Dkt. No. 17-1 at 19. He indicated, however, that he planned to engage in "suicidal actions" once released from the restricted housing unit. Id. PSU staff decided to keep him on observation status. Id.

7

On July 8, 2020, Waupun staff contacted the crisis clinician because the plaintiff threated to open the wound on his wrist if he was not given a band aid. Dkt. No. 17 at ¶25; Dkt. No. 17-1 at 17. "Per security, he received a band aid," and PSU staff was informed by security that the plaintiff did not harm himself. Dkt. No. 17 at ¶25; Dkt. No. 17-1 at 17. HSU staff followed up to check the status of the plaintiff's bite wound. Dkt. No. 16-1 at 14–15. A nurse reported it was "healing as expected" and showed no signs of infection. Id. at 15. The plaintiff later admitted to PSU staff that he had made the threat to open his wound because he wanted a dressing for his wound, and said if he didn't receive one, he would engage in self-harm by "severing a vein." Dkt. No. 17 at ¶25; Dkt. No. 17-1 at 17. He indicated that because he'd received a dressing for the wound, he did not have a current intent to harm himself, but also stated that he was "not playing games" and would "kill [himself]" when released to general population. Dkt. No. 17 at ¶25; Dkt. No. 17-1 at 17. Given his continued threats, the plaintiff remained on observation status. Dkt. No. 17 at ¶25; Dkt. No. 17-1 at 17–18.

The next day, the plaintiff refused to answer questions about his safety but asked to be released to general population so he could visit his mother, who was hospitalized. Dkt. No. 17 at ¶26; Dkt. No. 17-1 at 16. His "suggestion" was for PSU to arrange his transfer to the Wisconsin Resource Center within thirty days of his release from observation status. Dkt. No. 17 at ¶26; Dkt. No. 17-1 at 16. He said he would not harm himself or receive conduct violations if staff agreed to his "suggestion," but otherwise he would maintain his plan to

8

commit suicide once released. Dkt. No. 17 at ¶26; Dkt. No. 17-1 at 16. He reiterated his plan during a July 10, 2020 observation review, which PSU conducted after security staff reported that the plaintiff was "biting his arm." Dkt. No. 17 at ¶26; Dkt. No. 17-1 at 14. Security noted, however, that the plaintiff did not break the skin, and there was no visible bleeding. Dkt. No. 17-1 at 14.

On July 13, 2020, Van Buren conducted an observation review of the plaintiff. Dkt. No. 17 at ¶27; Dkt. No. 17-1 at 12–13. The plaintiff denied making previous demands about being transferred but maintained that he had suicidal ideations and plans to harm himself once released to general population. Dkt. No. 17 at ¶27; Dkt. No. 17-1 at 12–13. Van Buren concluded that the plaintiff was not genuinely suicidal because he was future-oriented, showed no signs of depression and placed restrictions on his plan to harm himself. Dkt. No. 17 at ¶27; Dkt. No. 17-1 at 13. Although Van Buren recommended that the plaintiff remain on observation status, she believed he was "using observation status as a way to avoid going to general population." Dkt. No. 17 at ¶27; Dkt. No. 17-1 at 13. The plaintiff disputes Van Buren's opinion, indicating that he has suffered from suicide attempts and self-harm behavior for two decades and that, in his experience, "there is no 'one-size' fits all methodology on how to determine how or when someone would attempt to commit suicide or engage in self-harm." Dkt. No. 28 at ¶23.

On July 14, 2020, the plaintiff told Van Buren during an observation review that he was tired of being on observation status and was "ready to come

out." Dkt. No. 17 at ¶28; Dkt. No. 17-1 at 11. He denied suicidal or self-harming ideations multiple times and complained he was unable to sleep on observation status. Dkt. No. 17 at ¶28; Dkt. No. 17-1 at 11. Given his statements and her conclusion that the plaintiff was using observation status to avoid moving to general population, Van Buren recommended the plaintiff be removed from observation status. Dkt. No. 17 at ¶28; Dkt. No. 17-1 at 11. Van Buren also avers that the plaintiff had not harmed himself while on observation status, Dkt. No. 17 at ¶28, but it is undisputed that he bit the wound on his right wrist on July 6, 2020, Dkt. No. 16-1 at 15.

On July 17, 2020, HSU staff treated a 1.5 cm-diameter wound on the plaintiff's right hand. Dkt. No. 16-1 at 14. A nurse noted no signs of infection and instructed the plaintiff to wash his arm with soap and water, pat it dry and apply a band aid. Id.

### 3. July 19, 2020 Incident

#### a. Cell Extraction

On July 19, 2020, the defendant worked a double shift from 6:00 a.m. until 10:00 p.m. Dkt. No. 15 at ¶8. At approximately 11:00 a.m., the defendant was part of a team of officers that extracted the plaintiff from his cell after finding him choking himself with his body weight by using a sheet wrapped around his neck and tied around his toilet. Id. at ¶10; Dkt. No. 17-1 at 8–9. Security staff reported that the noose was tied "pretty tight" around the plaintiff's neck. Dkt. No. 17-1 at 8. The defendant secured the plaintiff's legs to help release his body weight. Dkt. No. 15 at ¶11. Other officers secured the

plaintiff's hands and cut the sheet from his neck. Id. Prison staff strip-searched the plaintiff and placed him onto observation status. Id. at ¶¶12, 52.

A nurse was called to the HSU to see the plaintiff for complaints of neck pain. Id. at ¶66; Dkt. No. 16-1 at 7. Contrary to the earlier assessment, the nurse noted that the officer who cut the sheet from the plaintiff's neck "was able to get two fingers under the ligature indicating that it was not very tight." Dkt. No. 15 at ¶68; Dkt. No. 16-1 at 10. The nurse noted a "superficial abrasion" on the plaintiff's neck and some tenderness. Dkt. No. 15 at ¶69; Dkt. No. 16-1 at 9. The nurse reported that the plaintiff's breathing was unlabored, his nail beds were pink, he had no discoloration or edema on his head and his voice was not hoarse. Dkt. No. 15 at ¶69; Dkt. No. 16-1 at 7.

Later that day, security staff observed the plaintiff intentionally rubbing his handcuffs against the bite wound he had made on his wrist on July 6, 2020. Dkt. No. 15 at ¶53; Dkt. No. 17-1 at 9. Staff noted that the plaintiff "reopened the wound by biting his right wrist 'superficially.'" Dkt. No. 15 at ¶54; Dkt. No. 17-1 at 9. The plaintiff threatened to continue hurting himself unless he was "strapped down." Dkt. No. 15 at ¶54; Dkt. No. 17-1 at 9. HSU staff examined the plaintiff's wound, described as "an existing 1.5x2 cm open area." Dkt. No. 16-1 at 14. The medical records do not describe the plaintiff's wound as "superficial." Id. At about 1:00 p.m. the same day, the same nurse attempted to treat the plaintiff's wound, but he refused care. Id. at 13-14. The nurse reported that the plaintiff told him "why bother I am just going to fuck it up again." Id. at 14.

At 3:36 p.m., PSU staff interviewed the plaintiff, who reported feeling "good." Dkt. No. 15 at ¶55; Dkt. No. 17-1 at 9. He claimed that he would continue to engage in self-harming behavior until he was "strapped down," and said that after he had his dinner and took his medications he would "either decide to chill or 'turn up' due to being unhappy about how staff had 'handled' him earlier in the day." Dkt. No. 17-1 at 9. He told PSU staff he would "say what [he] needs to say" to be released from observation, but he reiterated his plan to kill himself once released to general population. Dkt. No. 15 at ¶56; Dkt. No. 17-1 at 9. The PSU clinician who interviewed the plaintiff consulted with security staff about possibly placing the plaintiff in bed restraints given his comments and continued intent to "self-harm or escalate his self-harm." Dkt. No. 15 at ¶58; Dkt. No. 17-1 at 9. The plaintiff was not placed in restraints at that time. Dkt. No. 17-1 at 9–10.

b. The Defendant's Observation Checks

Between 4:00 p.m. and 6:15 p.m., the defendant performed ten observation checks on the plaintiff—one every fifteen minutes. Dkt. No. 15 at ¶13; Dkt. No. 17-2 at 4; Dkt. No. 18 at ¶8. At 4:00 p.m., the defendant observed the plaintiff standing at his door and talking. Dkt. No. 17-2 at 4; Dkt. No. 18 at ¶9. The defendant avers that, at the 4:15 p.m. check, the plaintiff was threatening to harm himself and asked to be placed in full bed restraints. Dkt. No. 17-2 at 4; Dkt. No. 18 at ¶10. The defendant told the plaintiff he would notify the sergeant on duty, and he avers that he did tell the sergeant. Dkt. No. 18 at ¶10. The defendant recalls that there were "issues with other

inmates at the same time," so supervisory staff were unable to respond immediately to the plaintiff's demand to be placed in restraints. Id. at ¶11. The plaintiff says that at no time did an on-duty sergeant come to his cell. Dkt. No. 28 at ¶¶6, 20. He asserts that the first record of anyone coming to his cell was at 6:15 p.m., when Lt. Mitchell put a notation in the plaintiff's visitors' log that the plaintiff had self-harmed his right wrist. Id. at ¶20. See also, Dkt. No. 17-2 at 5.

The defendant avers that from 4:30 p.m. through 5:45 p.m., he saw the plaintiff "use his fingers like forceps to pinch" the wound on his arm, which "was very small and not actively bleeding." Dkt. No. 18 at ¶12. He denies seeing the plaintiff "biting new holes in his arm." Id. The defendant avers that at 6:00 p.m., he saw the plaintiff sitting at the door but did not see him biting his arm. Id. at ¶13. He says that, if he had seen the plaintiff biting his arm, he "would have documented it and notified the sergeant." Id. The observation log notes that the defendant observed the plaintiff "squeezing arm," "rubbing wounds" and talking during the observation checks. Dkt. No. 17-2 at 4.

The plaintiff asserts that he began biting at his wrist after the defendant left his cell at the conclusion of the 4:15 p.m. observation check. Dkt. No. 28 at ¶7. He says he continued to "bite and remove flesh from [his] right wrist" until 6:15 p.m., when a lieutenant arrived at his cell. Id. at ¶¶7–8. The plaintiff says that "on more than one occassion [*sic*]," the defendant witnessed him "biting on [his] right wrist." Id. at ¶10. He says the defendant told the plaintiff he would "have to engage in a certain amount of self-harm while in observation before

[prison staff] can strap [him] down/put [him] in bed restraints." Id. at ¶11. The plaintiff says he showed the defendant the "recent wound [he] had been creating while in observation" from 4:30 p.m. through 5:45 p.m. Id. at ¶22. According to the plaintiff, "[the defendant] never once instructed, ordered, or insisted that [the plaintiff] stop engaging in self-harm." Id. at ¶16. The plaintiff cites footage from the defendant's body camera in support of his account of the events, dkt. no. 26 at ¶16 (citing "DOC-007–016"), but he did not file any videos with the court. He also cites a photograph that he says depicts his wrist injury "sustained on 7-19-2020." Id. (citing Dkt. No. 28-1 at 1). The photograph shows a handcuffed right wrist with two open, light-pink, circular wounds on the thumb side. Dkt. No. 28-1 at 1. The defendant does not dispute that this photo shows the plaintiff's wrist and injuries inflicted in July 2020.

c.    Video Exhibits

The defendant filed a second declaration in support of his brief opposing the plaintiff's motion for sanctions. Dkt. No. 30. (The court discusses that motion below. See infra, Section III.) The defendant attached to his declaration exhibits of "Handheld camera footage previously produced" as DOC 007 through DOC 016. Dkt. Nos. 30-1 to 30-10. The defendant produced those videos to the court, which are labeled Exhibits 1004 through 1013 (or DOC 007 through 016, as the plaintiff refers to them). Id.; Dkt. No. 27 at ¶2.

In the first video, as the defendant is walking down the cell block, one can hear a voice yell, "Hey, Lange." The defendant responds, "What?" The defendant changes direction and approaches the plaintiff's cell—A203—and the

14

plaintiff asks the defendant to "go get the sergeant and call a white shirt to strap [him] down." Dkt. No. 30-1 (Ex. 1004) at 0:54–1:01. He tells the defendant he plans to engage in "self-harm again," raises his arm to the window in his cell and shows the defendant what he refers to as "this big ass hole in [his] wrist." Id. at 0:59–1:08. He tells the defendant he is "going to start biting on it all over again." Id. at 1:06–08. The defendant responds that he will "tell sergeant." Id. at 1:08–1:10. The defendant avers that he did not see the plaintiff actively biting his wrist at that time. Dkt. No. 30 at ¶6.

In the second video, the plaintiff stops the defendant as the defendant passes his cell and asks if the sergeant is "having a hard time making a decision." Dkt. No. 30-2 (Ex. 1005) at 0:00–0:05. Lange tells the plaintiff that the sergeant is "dealing with other inmates right now." Id. at 0:09–0:15. The plaintiff tells the defendant that the sergeant should "start dealing with [him] now." Id. at 0:15–0:17. He does not show his arm to the defendant or say anything about biting or harming himself. The defendant avers that he did not see the plaintiff actively biting his wrist at that time. Dkt. No. 30 at ¶7.

The plaintiff can be seen only briefly in the third video, apparently looking out the cell window, but he does not say anything to the defendant as the defendant passes his cell. Dkt. No. 30-3 (Ex. 1006) at 0:12–0:14. The video does not show the plaintiff biting his wrist, but the court cannot determine whether the plaintiff was showing the defendant his arm. Id. The defendant avers that the plaintiff did not stop him to speak with him (which the video

confirms) and avers that he did not see the plaintiff actively biting his wrist at that time. Dkt. No. 30 at ¶8.

The fourth video begins with the defendant at the plaintiff's cell. Dkt. No. 30-4 (Ex. 1007). The plaintiff has his left wrist (not the wrist he bit) up to the window of his cell door. Id. He says "I told you what I was gonna do," "[you] thought I was playing" and other inaudible comments. Id. at 0:00–0:07. The defendant acknowledges the plaintiff briefly before walking away. Id. at 0:03–0:07. The defendant avers that he did not see the plaintiff actively biting his wrist at that time. Dkt. No. 30 at ¶9.

In the fifth video, the plaintiff is at his door window as the defendant approaches. Dkt. No. 30-5 (Ex. 1008) at 0:10. He points out at the defendant, holds his right wrist up to the cell window, and says, "I told you[r] bitch ass. See what you made me do?" Id. at 0:10–0:15. He is not biting at his wrist as he speaks to the defendant. Id. The defendant says nothing and walks away. Id. The defendant avers that he saw the injury on the plaintiff's arm but did not see the plaintiff actively biting his wrist at that time. Dkt. No. 30 at ¶10.

The sixth video begins with the defendant at the plaintiff's cell. Dkt. No. 30-6 (Ex. 1009). The plaintiff cannot be seen but can be heard saying to the defendant, "Turn your body camera on." Id. at 0:01–0:02. The defendant responds, "It is on," and keeps walking. Id. at 0:02–0:03. The defendant's declaration does not contain a statement about this video.

The seventh video is the longest. Dkt. No. 30-7 (Ex. 1010). The video begins with the defendant donning disposable gloves. Id. at 0:00–0:10. The

defendant stops at the plaintiff's cell, and the plaintiff is at his door window showing the defendant his right wrist. Id. at 0:18. It is difficult to see his injury, but the plaintiff again points at the defendant and says, "I told your bitch ass, you didn't listen. I told you what I was going to do, and you walked by six times." Id. at 0:18–0:25. Another incarcerated person says, "He's been doing this shit for almost an hour and a half, dude keep walking by." Id. at 0:26–0:27. The defendant states, "A certain amount of self harm is expected in obs." Id. at 0:28–0:31. The other incarcerated person says, "You not supposed to let him do it, you dumb bitch." Id. at 0:30–0:36. The plaintiff tells the defendant, "We can keep on playing this game . . . I'mma bite all the way around this [inaudible]. So you all make the choice . . . strap me down." Id. at 0:41–0:53. The defendant states, "Some of that's from the handcuffs this morning." Id. at 0:53–0:55. The plaintiff keeps his right wrist pressed up against the window during this discussion. Id. It is difficult to hear the plaintiff over other incarcerated persons shouting (apparently at the defendant).

At 1:11, another officer approaches and speaks with the plaintiff at his cell door. Their conversation is somewhat lengthy and mostly inaudible, but for the duration of it, the plaintiff keeps his hands above his head, visible through the door window. Id. at 1:11–3:30. At one point, the other officer points to himself and the defendant and tells the plaintiff they "don't have the power to say, 'Oh yeah, we're going to get the straps and strap you down.'" Id. at 2:40–2:44. He suggests the plaintiff talk to the "white shirt," who is nearby. Id. at 2:32–2:40. At one point, the second officer asks the plaintiff if it was the

plaintiff "over there by the toilet, you wrapped it around the toilet or whatever?" Id. at 3:22–3:25. The officer then says, "Man, what are you doing?" Id. at 3:25–3:26. The plaintiff responds, "I tried to kill myself." The officer asks, "Why?" Id. at 3:26–3:28. The plaintiff's answer is inaudible, but there appears to be a debate between the officer and the plaintiff about what the officers will do if he the plaintiff tries to kill himself (such as taking him to the hospital). The officer says, "I told you I was going to go tell the white shirt" and that the plaintiff should stop harming himself until then. Id. at 4:36–4:50. The defendant does not speak with the plaintiff again, and both officers leave the plaintiff's cell front. Id. at 4:50–4:51. The defendant avers that the plaintiff told him he had previously bitten his wrist, but that he did not see the plaintiff actively biting his wrist at that time. Dkt. No. 30 at ¶11.

The eighth video is less eventful. Dkt. No. 30-8 (Ex. 1011). The defendant walks by the plaintiff's cell, and the plaintiff can be seen in the window. Id. at 0:12–0:16. He is not showing either wrist and says nothing to the defendant, and the defendant walks to the next cell. Id. The defendant avers that he did not see the plaintiff actively biting his wrist at that time. Dkt. No. 30 at ¶12.

In the ninth video, the defendant approaches the plaintiff's cell, but the plaintiff is not in the door window. Dkt. No. 30-9 (Ex. 1012) at 0:10. The defendant glances into the other window of the cell, but the camera does not view into the cell. Id. at 0:13–0:17. The defendant again looks through the door window and then walks off. Id. at 0:18–0:21. An incarcerated person can be heard yelling, "At the end of the day," followed by something inaudible, several

18

times; it is impossible to determine who is talking. Id. at 0:04–0:23. The defendant's declaration does not contain a statement specific to this video.

The tenth video begins with the defendant at the plaintiff's cell front. Dkt. No. 30-10 (Ex. 1013). He briefly glances into the door window and then walks off. Id. at 0:00–0:02. He does not speak with the plaintiff, and the plaintiff says nothing to the defendant. Id. The defendant avers that he did not see the plaintiff actively biting his wrist at this time or at any of the times depicted in the videos. Dkt. No. 30 at ¶13.

d.    Treating the Plaintiff's Wounds and Aftermath

At 6:15 p.m., security staff informed the on-call clinician that the plaintiff had again harmed himself and "had two nickel sized bites on his right wrist, one above the other on the pinky side." Dkt. No. 15 at ¶¶59, 71; Dkt. No. 16-1 at 12; Dkt. No. 17-1 at 7. A nurse provided "basic first aid" by cleaning the plaintiff's wound, applying Bacitracin and dressing the wound with a "large bandaid . . . held securely by medical tape." Dkt. No. 15 at ¶71; Dkt. No. 16-1 at 12. She reported the plaintiff saying, "I couldn't help myself. I am going to kill myself in population when I get there." Dkt. No. 16-1 at 12. The plaintiff did not complain about complications from his wound, which appeared to be healing without complications. Dkt. No. 15 at ¶73; Dkt. No. 16-1 at 3.

PSU supervisors and HSU staff decided to place the plaintiff in bed restraints to ensure his safety. Dkt. No. 15 at ¶60; Dkt. No. 17-1 at 7–8. The defendant was not involved in that process. Dkt. No. 15 at ¶19. The defendant avers that as a corrections officer, he does not have the authority to place an

incarcerated person into mechanical restraints. Dkt. No. 18 at ¶15. He says that decision must be made by supervisory staff in conjunction with HSU and PSU staff. Id.

The next day—July 20, 2020—Van Buren avers that she saw the plaintiff for a review of his bed restraints. Dkt. No. 15 at ¶61; Dkt. No. 17-1 at 6. The plaintiff reported engaging in self-harm because he wanted a different cell. Dkt. No. 15 at ¶61; Dkt. No. 17-1 at 6. He also reported he was upset he did not get his inhaler when he requested it, and that is when he tied the bed sheet around his neck. Dkt. No. 15 at ¶61; Dkt. No. 17-1 at 6. He said he also was upset when he was not placed in bed restraints when requested. Dkt. No. 15 at ¶62; Dkt. No. 17-1 at 6. The plaintiff disputes Van Buren's assertions, saying that he never told Van Buren that he bit himself because he wanted to get his cell moved or because he didn't get his inhaler. Dkt. No. 28 at ¶25.

The plaintiff remained on observation status until July 22, 2020, when he denied suicidal thoughts and demonstrated future-oriented thinking. Dkt. No. 15 at ¶64; Dkt. No. 17-1 at 3. The plaintiff remained on a temporary linen restriction and was scheduled for a follow-up with PSU staff. Dkt. No. 15 at ¶65; Dkt. No. 17-1 at 3.

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson, 477 U.S. at 248. "Material facts" are those that "might affect the outcome of the suit." Id. Disputes about proposed facts "that are not outcome-determinative are not material and will not preclude summary judgment." Montgomery v. Am. Airlines, Inc., 626 F.3d 382, 389 (7th Cir. 2010).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

B.     Eighth Amendment Standard

The court analyzes the plaintiff's claim that the defendant ignored his threats of self-harm under the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To proceed on this claim, the plaintiff must satisfy objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must present evidence showing that he "is incarcerated under conditions posing a substantial risk of serious harm." Id. The Seventh Circuit has said that "prison officials have an obligation to intervene when they know a prisoner suffers from self-destructive

tendencies." Rice _ex rel._ Rice v. Corr. Med. Servs., 675 F.3d 650, 665 (7th Cir. 2012), abrogated on other grounds by Kemp v. Fulton County, 27 F.4th 491 (7th Cir. 2022). That means the risk of harm sufficient to satisfy the objective component of an Eighth Amendment claim may come from an incarcerated person's act or threat of self-harm. Miranda v. Cty. of Lake, 900 F.3d 335, 349 (7th Cir. 2018); see also Goodvine v. Litscher, Case No. 16-CV-703-WMC, 2017 WL 11508138, at *5 (W.D. Wis. July 5, 2017) (citing Minix v. Canarecci, 597 F.3d 824, 831 (7th Cir. 2010)) ("Significant self-harm constitutes 'serious harm.'").

To satisfy the subjective component, the plaintiff must show that the defendant subjectively knew the plaintiff "was at substantial risk" of harming himself and "intentionally disregarded the risk." Collins v. Seeman, 462 F.3d 757, 761 (7th Cir. 2006). A prison official will not be held responsible under the Eighth Amendment if he fails "to alleviate a significant risk that he should have perceived but did not." Farmer, 511 U.S. at 838. The "risk of future harm must be sure or very likely to give rise to sufficiently imminent dangers before an official can be liable for ignoring that risk. Davis-Clair v. Turck, 714 F. App'x 605, 606 (7th Cir. 2018) (internal quotation omitted). Nor will a prison official be liable "if he responds reasonably to a risk, even if the harm was not avoided." See Barrows v. Goldman, 858 F. App'x 199, 201 (7th Cir. 2021) (citing Farmer, 511 U.S. at 843; and Johnson v. Dominguez, 5 F.4th 818, 824–25 (7th Cir. 2021)). In short, the evidence must demonstrate the prison official's "actual, personal knowledge of a serious risk, coupled with the lack of

any reasonable response to it." <u>Ayoubi v. Dart</u>, 724 F. App'x 470, 474 (7th Cir. 2018) (citing <u>Farmer</u>, 511 U.S. at 837, 844–45).

C.    <u>Analysis</u>

Over the course of several days, the plaintiff bit two wounds into his wrist and attempted to hang himself with a bedsheet. The complaint does not address the first wound, which the plaintiff caused on July 6, 2020. Nor is the July 19, 2020 incident during which the plaintiff tied a sheet around his neck at issue. It is undisputed that the defendant assisted in removing the plaintiff from the sheet and from his cell, but the plaintiff has not alleged that the defendant is liable to him for any injury he may have suffered related to that incident. The only incident at issue is the second of the two bite wounds, which it is undisputed the plaintiff self-inflicted on July 19, 2020. The plaintiff sued only the defendant related to that wound and the alleged risk it posed to his health.

The defendant's brief in support of his motion for summary judgment says nothing about the subjective element of the plaintiff's deliberate indifference claim and does not contest whether the defendant was aware of, but disregarded, the plaintiff's threat to harm himself. Dkt. No. 14 at 14–17. The defendant characterizes the plaintiff's behavior as "attempted suicide and self-harm" but asserts that the plaintiff "never faced an objectively serious risk of harm" because he inflicted only "minor wounds on himself." <u>Id.</u> at 15–16. The defendant describes the plaintiff's wounds as "only superficial, barely requiring any medical treatment;" he recounts the "basic first aid" the nursing

staff provided the plaintiff—"cleansing the wound with wound cleanser, applying bacitracin (an antibiotic ointment), and covering the wounds with a bandage." Id. The defendant contends that these "[m]inor cuts . . . do not demonstrate that a prisoner 'experienced any cognizable harm.'" Id. (quoting Lord v. Beahm, 952 F.3d 902, 905 (7th Cir. 2020)). The defendant recounts the evidence that he asserts shows the plaintiff was threatening to harm himself "for secondary gain . . . without actually having any suicidal intentions or causing himself significant injury." Id. at 17. He contends that the plaintiff's "self-inflicted biting wounds were not a serious suicide attempt and he suffered only minor, superficial wounds . . . [which] barely required medical care, only some ointment and a gauze bandage." Id. The defendant concludes that that injury "is not enough to maintain an Eighth Amendment deliberate indifference claim" because it fails to satisfy the requirement that the plaintiff "show he faced an objectively serious risk of harm." Id.

The defendant relies heavily on the Seventh Circuit's decision in Lord v. Beahm, in which an incarcerated person exposed himself to a female guard, then threatened to kill himself if he was not allowed to speak with her. Lord, 952 F.3d at 904. After the plaintiff was denied the ability to speak with the female guard, another officer "saw what appeared to be two blood droplets on [the plaintiff's] cell door window." Id. When the guard came to the plaintiff's cell front, the plaintiff showed the guard a razor blade and said he was trying to kill himself. Id. The guard secured the blade and moved the plaintiff to another cell. Id. Medical personnel later "applied a gauze bandage to the few minor

scratches" on the plaintiff's forearm. Id. No other medical treatment was necessary. Id. The plaintiff sued the officers whom he said failed to respond his suicide threat. Id. The district court entered summary judgment for the defendants, concluding that the evidence showed that the plaintiff had not suffered "any objectively serious medical need." Id. The district court reiterated that the plaintiff's self-inflicted injuries constituted "only minor scratches, requiring 'but a brief cleaning and a single application of gauze.'" Id.

The Seventh Circuit affirmed the district court's conclusion that the plaintiff had failed to allege "a recoverable injury" under §1983. Id. at 905. The court described the plaintiff's self-inflicted injuries as "trivial—indeed, almost nonexistent" and as "minor scratches, quickly and easily treated with gauze bandages." Id. The court explained that the plaintiff sought money damages but failed to present "evidence of injury." Id. The court concluded that because the record contained no facts showing the plaintiff suffered a serious injury, the district court properly dismissed the case at summary judgment. Id.

Lord is not controlling here. The plaintiff in Lord sought damages "solely for the risk to his life—a serious medical need—the defendant officers ignored by not immediately responding to his suicide threat." Id. This plaintiff has not asserted that he posed a *risk to his life* and that the defendant was deliberately indifferent to that risk. He asserts that the defendant was deliberately indifferent to the plaintiff's *risk to harm himself* by biting his arm if he were not strapped down. The court must determine whether biting one's arm constitutes a serious risk of harm and, if so, whether the defendant knew the plaintiff was

at serious risk of harming himself by biting his arm and failed to respond reasonably to that known risk.

        1.    *Serious Risk of Harm*

It is undisputed that the plaintiff bit or chewed "a quarter size bite wound" on his right wrist on July 6, 2020, about two weeks before the incident at issue here. Dkt. No. 16-1 at 15. HSU staff cleaned the wound, which was not bleeding, applied ointment and covered it with gauze. Id. That wound may have been non-serious in nature, but that does not mean an incarcerated person could never seriously harm himself by biting himself. Indeed, the plaintiff previously had threatened to engage in self-harm by "severing a vein," which he may have planned to do with his teeth. Dkt. No. 17 at ¶25; Dkt. No. 17-1 at 17.

Other courts in this circuit have addressed cases where an incarcerated person caused serious injury by biting his own wrist or arm. See Bowers v. Pollard, 345 F. App'x 191, 194 (7th Cir. 2009) (noting that the incarcerated plaintiff "once bit his own arm to the point that he required hospitalization"); LaBrec v. Meeker, 345 F. Supp. 3d 1040, 1041 (W.D. Wis. 2018) (incarcerated plaintiff alleged "he bit . . . a large vein in his arm,' which caused him to lose so much blood that he had to be taken to the hospital"); Davila v. Teeling, No. 17-CV-337-JPS, 2017 WL 2271426, at *3 (E.D. Wis. May 23, 2017) (incarcerated person in restraint chair "bit himself enough to cause bleeding" and was eventually "taken to the hospital for treatment for the bite wounds"). But see Wynn v. Wogernese, No. 18-CV-333-JDP, 2019 WL 6312266, at *7 (W.D. Wis. Nov. 25, 2019) ("Unlike a prisoner with a contraband razorblade or makeshift

noose, no reasonable jury would conclude that [the incarcerated plaintiff] was at substantial risk of inflicting grievous injuries on himself using his own teeth.").

Construing the facts in the light most favorable to the plaintiff as the nonmoving party, the court finds that his threats to harm himself by biting his wrist could constitute a substantial risk of serious self-harm sufficient to satisfy the objective component of an Eighth Amendment claim. See Davila, 2017 WL 2271426, at *3 ("While it is not clear that Plaintiff's biting could have actually led to his death, it was nevertheless a serious self-harming action.").

### 2. *Reasonable Response*

A court in the Western District of Wisconsin recently recognized that "the court of appeals has held repeatedly that statements that a prisoner is going to kill or seriously harm himself are sufficient to put prison staff on notice of a strong likelihood that a prisoner will engage in self harm." LaBrec, 345 F. Supp. 3d at 1042 (citing Miller v. Harbaugh, 698 F.3d 956, 962–63 (7th Cir. 2012); and Sanville v. McCaughtry, 266 F.3d 724, 737–38 (7th Cir. 2001)). Similarly, when a defendant prison officer is aware of an incarcerated person's recent suicide attempt, "it would be improper to grant summary judgment or judgment as a matter of law on the question whether defendants were aware of a substantial risk of serious harm." Mombourquette *ex rel.* Mombourquette v. Amundson, 469 F. Supp. 2d 624, 638–39 (W.D. Wis. 2007) (citing cases).

It is undisputed that the plaintiff told the defendant he was going to harm himself by biting his wrist. The video exhibits show the plaintiff asking

the defendant to "go get the sergeant and call a white shirt to strap [him] down" because he plans to engage in "self-harm again," and that he is "going to start biting on [his wrist wound] all over again." Dkt. No. 30-1 at 0:54–1:08. The plaintiff later tells the defendant "I told you what I was gonna do," "[you] thought I was playing." Dkt. No. 30-4 at 0:00–0:07. He holds his injured wrist up to the window of his cell and says to the defendant, "See what you made me do?" Dkt. No. 30-5 at 0:10–0:15; "I told you what I was going to do, and you walked by six times." Dkt. No. 30-7 at 0:18–0:25. He threatens the defendant that he will "bite all the way around this [inaudible]. So you all make the choice . . . strap me down." Id. at 0:41–0:53. Another officer advises the plaintiff to talk to the "white shirt," who is nearby. Id. at 2:32–2:40. The plaintiff tells the officer he earlier "tried to kill [him]self" with the bedsheet he tied around his neck and to the toilet in his cell. Id. at 3:26–3:28. It also is undisputed that earlier on July 19, 2020, the defendant was part of a team of officers that extracted the plaintiff from his cell after finding him choking himself with a sheet tied to his toilet. Dkt. No. 15 at ¶¶8, 10; Dkt. No. 17-1 at 8–9.

The evidence shows that the defendant was aware of the plaintiff's threats to harm himself by biting his wrist, which still bore a wound from the plaintiff's previous self-harm, and that the defendant was aware that the plaintiff had engaged in self-harm earlier the same day that he told the defendant he was going to bite his wrist again. Given these facts, a reasonable jury could find that the defendant was aware of a strong likelihood that the plaintiff would again harm himself. It would be improper to grant summary

judgment for the defendant on the ground that he was unaware of a substantial risk that the plaintiff would self-harm by biting his wrist again.

But a reasonable jury could not find that the defendant responded unreasonably to the risk that the plaintiff would harm himself. The defendant checked on the plaintiff every fifteen minutes while the plaintiff was in observation. He told the plaintiff he would tell a sergeant, and the plaintiff does not dispute that the defendant did that. It appears that the sergeant was unable to respond immediately to the plaintiff's cell because he was busy with other incarcerated persons. It is undisputed that no superior officer came to the plaintiff's cell until after he had already bitten the wound into his wrist. But that does not mean the defendant was deliberately indifferent to the plaintiff's risk of self-harm. The defendant cannot be held liable for his superior officers being busy with other incarcerated persons when he informed them that the plaintiff was threatening to harm himself.

As the Seventh Circuit has observed, "Mental health is notoriously difficult to assess and treat." Quinn v. Wexford Health Sources, Inc., 8 F.4th 557, 569 (7th Cir. 2021). This court has noted that

> [a]rguably, the only way to prevent a determined inmate from harming himself would be to place him in restraints twenty-four hours a day. Even in a bare cell, with continuous monitoring, an inmate could bang his head against walls or doors, or use his own teeth and fingernails to cause serious self-injury before the guards observing him have time to intervene. . . . Short of twenty-four/seven restraint, prison staff cannot guarantee that an inmate will not harm himself.

Sierra-Lopez v. Brown County, No. 17-CV-1222-PP, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019). This court went on to note that cases in which

courts found officer liability, or allowed a plaintiff to proceed to trial on the question of liability, "generally are limited to those situations in which the guards were essentially asleep at the switch or acted recklessly . . . The plaintiff must show 'something approaching a total unconcern' for the inmate's safety." Id. (quoting Rosario v. Brawn, 670 F.3d 816, 822 (7th Cir. 2012) (internal citations omitted).

The evidence does not show that the defendant approached total unconcern for the plaintiff's safety. The defendant is a correctional officer, not a medical professional or a psychologist. While the plaintiff was on observation status, the defendant performed wellness checks every fifteen minutes as prison rules dictate. Video evidence confirms that the defendant performed those checks, during which he visually observed and/or spoke with the plaintiff. The defendant avers that the plaintiff was not actively biting his wrists during those wellness checks, and none of the videos of the wellness checks show the plaintiff actively biting his wrist. When the plaintiff expressed an intent to harm himself again, the defendant relayed that concern to a sergeant and continued the wellness checks in the meantime. Another officer eventually arrived and informed the plaintiff that he and the defendant did not have the authority to order the plaintiff strapped down and questioned why the plaintiff was trying to harm himself. Given the defendant's position as a correctional officer, his response of reporting the plaintiff's threats to harm himself to a sergeant was a reasonable course of action. That the plaintiff nonetheless found a way to harm himself with his own body does not show that the

defendant was "essentially asleep at the switch or acted recklessly." <u>Id.</u>; <u>see</u> <u>Wynn</u>, 2019 WL 6312266, at *6 (granting summary judgment for correctional officer who "notified his supervisors" that incarcerated person was biting "small wounds on his wrist" and "check[ed] on [him] every fifteen minutes" in accordance with observation order).

Nor is it clear what else the defendant could have done to prevent the plaintiff biting his own wrist. The plaintiff does not dispute that the defendant did not have the authority to order the plaintiff to be "strapped down," and the unknown officer who spoke with the plaintiff on the seventh video confirms that fact. The plaintiff alleged in his complaint that the defendant said nothing, did not intervene, did not tell a supervisor and did not tell the plaintiff to stop. But the defendant *did* say something—he said he would tell the sergeant. He *did* tell the sergeant, although the sergeant did not come right away. He *did* continue to check on the plaintiff every fifteen minutes. And while the plaintiff alleges that the defendant saw him biting his arm, the video does not support that claim. <u>See</u> <u>Gillis v. Pollard</u>, 554 F. App'x 502, 506 (7th Cir. 014) (citing <u>Scott v. Harris</u>, 550 U.S. 372, 378-80 (2007) ("the Supreme Court has . . . held that where video evidence contradicts the plaintiff's version of events, the court should not accept the plaintiff's story for purposes of summary judgment.").

Because the evidence does not show that the defendant responded unreasonably to the risk that the plaintiff might harm himself, the court will grant summary judgment in favor of the defendant.

### III.    Plaintiff's Motion for Sanctions (Dkt. No. 21)

The plaintiff asks for sanctions, alleging that the defendant submitted a false declaration. Dkt. No. 21 at 1. He asserts that video evidence contradicts the defendant's statement in his declaration in support of his motion for summary judgment that the defendant did not see the plaintiff biting his arm. Id. at ¶¶9–10. The plaintiff argues that the video evidence shows "multiple instances where [the defendant] in fact did see [the plaintiff] engaging in self-harm." Id. at 4. He asserts that the video evidence shows that the defendant "maliciously fabricated evidence and falsely made statements under penalty of perjury known to be false." Id. at 6. The plaintiff seeks damages for the alleged fraud and asks the court to "dismiss the action in favor of the plaintiff." Id. at 7.

The plaintiff did not include the video evidence with his motion. On April 20, 2022, the court received a letter from the plaintiff in which he asserted that he could not "physically send the body camera footage worn by [the defendant] on 7-19-2020, due to security concerns." Dkt. No. 27 at ¶2. He said that "[t]he only way the court can possibly view the video footage exhibit . . . is by contacting the defendants and requesting the exhibit." Id. at ¶2. But on May 2, 2022, the plaintiff filed another letter that purported to include "exhibit video footages labeled DOC-007–016, which is to be used [and] submitted as attached to the plaintiff's motion requesting sanctions." Dkt. No. 32. There was no exhibit enclosed with the letter.

Because he is the one asking the court to impose sanctions, the plaintiff bears the burden of persuasion; it is his responsibility to present evidence showing that the defendant's conduct warrants sanctions. By failing to file the video exhibits with the court, he failed to satisfy that burden. But the *defendant* filed the video exhibits, which the court has viewed and has discussed above. See supra, Section I.B.3.c. Contrary to the plaintiff's assertions, the videos do not show the plaintiff actively biting his arm. They show the plaintiff speaking with the defendant and the defendant looking through the plaintiff's cell windows. The video has a limited range of vision; one cannot tell from viewing it what the plaintiff was doing inside the cell when the defendant was at his cell window. Even in the segments where the plaintiff's arm or arms are visible, once cannot tell whether there are injuries there. The only document supporting the plaintiff's version of the events is his declaration in support of his motion. Dkt. No. 22. The defendant contests that account of the events and avers that he never saw the plaintiff actively biting himself at the times depicted in the videos. Dkt. No. 30. That the defendant disagrees with the plaintiff, or does not remember the incident the way the plaintiff does, does not mean the defendant lied under oath. The plaintiff is not entitled to sanctions, and the court will deny his motion.

## IV. Motion to Stay Proceedings (Dkt. No. 23) and Motion to Appoint Counsel (Dkt. No. 35)

The basis for the plaintiff's motion to stay proceedings was his opinion that if the court ruled in his favor on his motion for sanctions, that would resolve the motion for summary judgment in his favor. Dkt. No. 23. The court

has denied the motion for sanctions. Further, thought he asked the court to stay the proceedings, the plaintiff still responded to the defendant's motion for summary judgment. The court will deny the motion to stay the proceedings as moot.

In his motion to appoint counsel, the plaintiff stated that he could not afford a lawyer, that the issues in the case were complex, that the trial likely would involve conflicting testimony and that a lawyer would be able to help him present evidence and cross-examine witnesses. Dkt. No. 35. The issues in this case were not too complex for the plaintiff to handle; he represented himself very well. There will be no trial, because the court is granting summary judgment in favor of the defendant and dismissing the case. The court will deny the motion to appoint counsel as moot.

## V.     Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 13.

The court **DENIES** the plaintiff's motion for sanctions. Dkt. No. 21.

The court **DENIES AS MOOT** the plaintiff's motion to stay the proceedings. Dkt. No. 23.

The court **DENIES AS MOOT** the plaintiff's motion to appoint counsel. Dkt. No. 35.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 4th day of November, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**